Jonathan O. Hafen (6096) (jhafen@parrbrown.com)
Cheylynn Hayman (9793) (chayman@parrbrown.com)
Parr Brown Gee & Loveless, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

Jacquelyn L. Thompson (jthompson@fordharrison.com)*
FordHarrison, LLP
2000 M St. NW, Suite 505
Washington, DC 20036
Telephone: (202) 719-2000
Facsimile: (202) 719-2077

Attorneys for Plaintiff Breeze Aviation Group, Inc.
*Admitted pro hac vice*

---

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BREEZE AVIATION GROUP, INC.<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL MEDIATION BOARD,<br><br>Defendant. | **COMBINED RESPONSE TO MOTIONS TO DISMISS FILED BY DEFENDANT NATIONAL MEDIATION BOARD AND INTERVENOR AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**<br><br>**(Hearing Requested)**<br><br>Case No. 2:22-cv-514-DBB<br><br>Judge David B. Barlow |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 3

FACTUAL ALLEGATIONS ................................................................................ 3

ARGUMENT ...................................................................................................... 13

    I.    The Board Grossly Violated the RLA by Excluding 71 Breeze Employees in Training from Voting in the Union Election. ................................................................... 14

        A.    The Board's Interpretation of "Employee" Is Contrary to the RLA............................ 14

        B.    The Board's and ALPA's Reliance on *United Air Lines* and *Eastern Air Lines* Is Misplaced. .................................................................................... 20

    II.    The Board Grossly Violated the RLA by Refusing to Modify the Eligibility Cut-Off Date to Satisfy the RLA's Majority Participation Requirement. ............................... 25

CONCLUSION ................................................................................................... 28

Plaintiff Breeze Aviation Group, Inc. ("Breeze") respectfully submits this Combined Response to the Motion to Dismiss [Dkt. No. 28] filed by Defendant National Mediation Board (the "Board") under Rule 12(b)(1) of the Federal Rules of Civil Procedure and the Motion to Dismiss [Dkt. No. 33] filed by Intervenor Air Line Pilots Association, International ("ALPA") under Rule 12(b)(6) of the Federal Rules of Civil Procedure (collectively, the "Motions").

## INTRODUCTION

The Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, guarantees to a "majority" of a craft or class of airline employees the right to decide whether to be represented by a union for purposes of collective bargaining. Despite this explicit statutory mandate, the Board directed that a union election proceed among Breeze's Flight Deck Crewmembers (Pilots) that ***excluded*** the majority (71 of 131) of the Flight Deck Crewmembers, and then certified a union to represent all 131 Flight Deck Crewmembers based on the votes of a mere 29 Flight Deck Crewmembers during that flawed election. The Board's actions blatantly disregard the plain and unambiguous language of the RLA and unfairly and erroneously disenfranchise a majority of Breeze's Flight Deck Crewmembers. As such, the Board has grossly violated its statutory obligations under the RLA.

Because the Board grossly violated the RLA, this Court has subject matter jurisdiction to review the Board's determinations, and Breeze has stated plausible claims for declaratory judgment and injunctive relief. The Board's and ALPA's Motions should be denied.

## FACTUAL ALLEGATIONS

The following relevant factual allegations are taken from Breeze's Complaint [Dkt. No. 2] ("Compl."). This Court must accept these allegations as true in reviewing the Motions. *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009) ("A facial attack on the complaint's

allegations regarding subject matter jurisdiction questions the complaint's sufficiency and requires the court to accept the allegations as true."); *id.* at 1098 ("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.").

### Breeze's Rapid Start-Up Growth and Pilot Training Delay

1.     Breeze is the fastest growing, best-capitalized start-up airline in the United States. [Compl. ¶ 21.]

2.     Breeze operated its first commercial flight on May 27, 2021.  [Compl. ¶ 21.]  In the 15 months following that first flight, Breeze's operations grew rapidly to a fleet of 23 aircraft consisting of 16 Embraer E190 and E195 aircraft and 7 Airbus A220 aircraft.  The Airbus planes were added to its operating fleet following the completion of a much longer than expected certification process with the U.S. Federal Aviation Administration ("FAA").  [Compl. ¶ 22.]

3.     Breeze planned to begin flying the Airbus A220s by March 31, 2022, but the A220 flights were delayed by several months due to a lengthy FAA certification process.  Breeze has a firm order for 80 Airbus A220 aircraft, with a contract to receive approximately one A220 aircraft each month for the next 6 years.  By the end of 2022, Breeze originally anticipated operating 28 aircraft in its fleet, although that number has since dropped to 27 aircraft due to Airbus delivery delays.  [*See* Compl. ¶ 23.]

4.     As a start-up airline with plans for rapid growth in its first year of operation, Breeze was focused on hiring and building an initial core of employees, including its pilots.  In 2020, Breeze hired eight pilots.  In the first half of 2021, Breeze hired an additional 49 pilots.  In the second half of 2021, Breeze hired another 19 pilots.  In January 2022 alone, Breeze hired 27

additional pilots.  In February 2022, Breeze hired another 14 pilots.  In March 2022, Breeze hired

23 more pilots, for a total of 64 pilots hired in the first three months of 2022.  [Compl. ¶ 24.]

5.       As of March 31, 2022, the last day of the last payroll period ending before the day

on which the Board received the applicable union application in this case, Breeze had hired 137

Flight Deck Crewmembers (Pilots), all of which were actively on the Company's payroll.  71 of

those 137 pilots were in training.  On August 11, 2022, the date the Board announced the election

results, Breeze employed 260 pilots, and it anticipates employing over 300 pilots by the end of

2022.  [Compl. ¶ 25.]

6.       Breeze initially had planned to begin Airbus A220 pilot training in early December

2021—more than three months before submission of the applicable union application in this case.

Although Breeze submitted its training manuals for FAA review and approval on October 21,

2021, the FAA's A220 manual approval process took many more months than anticipated.  While

the FAA had indicated that it planned to provide initial approval for Breeze pilot training to begin

in November 2021, such approval was not granted until January 10, 2022.  The FAA also did not

provide Breeze with official feedback on the training manuals until March 29, 2022.  [Compl. ¶

26.]

7.       As a result, the FAA's official letter closing out the Phase 3 review and approval

process finished several months behind schedule on April 20, 2022.  [Compl. ¶ 26.]

8.       Due to the FAA's limited resources and unusually lengthy review process, Breeze

could not begin Airbus A220 pilot training until January 2022.  With 80 new A220 aircraft on

order and a business strategy to quickly launch flights in new markets as soon as the FAA

certification process was complete, the 71 newly hired pilots were an integral part of its business

plan, and Breeze could not have scaled up and operated its airline business without having this large number of pilots stacked up, trained, and ready to fly the A220s when the aircraft arrived on property.  [Compl. ¶ 27.]

9.     Breeze hired these pilots with the plan that they would have completed training and been ready to fly the A220 aircraft once they were delivered.  However, the several months' long delay in the FAA certification process of the A220s created a bottleneck and caused most of the 71 pilots to delay completion of their training.  Most of the pilots who were being trained on the A220s were unable to complete training and fly the A220s in revenue service due to the abnormally lengthy FAA review process.  [Compl. ¶ 28.]

10.     Before Breeze was able to fly the A220s in revenue service, Breeze also needed to complete up to 100 hours of domestic and supplemental Proving Test flights.  The Proving Test flights were originally planned to be completed by March 15, 2022.  However, due to the FAA's delayed review process, limited resources, and workload, Breeze was not able to begin Proving Test flights until May 9, 2022.  [Compl. ¶ 28.]

11.     After completing the Proving Test flights, the FAA requires time to complete administrative functions prior to certifying the A220s, after which the aircraft can be placed in revenue service.  The first Breeze A220 flight was operated in revenue service on May 25, 2022.  [Compl. ¶ 28.]

**ALPA Applies to Represent Breeze's Flight Deck Crewmembers**

12.     On April 6, 2022, the Air Line Pilots Association, International ("ALPA") filed an application with the Board seeking a representation election among Breeze's Flight Deck

6

Crewmembers.  In its application, ALPA stated that there were 69 Breeze employees in the craft or class.  [Compl. ¶ 29.]

13.     Pursuant to the Board's instructions, on April 11, 2022, Breeze provided the Board with a list of the 137 Flight Deck Crewmembers with an employee-employer relationship as of the eligibility cut-off date March 31, 2022.  These 137 individuals were employed as full-time pilots and on Breeze's payroll as of the cut-off date March 31, 2022.  Breeze also submitted samples of the employees' signatures so the Board could verify the signatures on the authorization cards ALPA submitted.  [Compl. ¶ 30.]

14.     Following Breeze's submission, ALPA filed challenges and objections to the list of eligible voters provided by Breeze on April 19, 2022.  ALPA alleged that a total of 72 individuals on the list were not employees within the Flight Deck Crewmembers craft or class and were ineligible to vote.  Relevant to this action, ALPA challenged the inclusion of the 71 pilots who had not completed training and were not released to regular line service before the March 31, 2022 cut-off date.  [Compl. ¶ 31.]

**Breeze Asks the Board to Find That the 71 Pilots Were Employees Within the Craft of Class Properly Included on the List or, Alternatively, Modify the Eligibility Cut-off Date**

15.     In response, on May 3, 2022, Breeze requested the Board to find the 71 pilots were employees within the craft or class of Flight Deck Crewmembers properly included on the list. Breeze argued that the 71 Breeze pilots on the list were full-time Breeze employees on the March 31, 2022 cut-off date.  As part of Breeze's rapid start-up expansion plan, these 71 pilots were hired as full-time Breeze pilots some months before ALPA filed its application with the Board in April 2022.  [Compl. ¶ 32.]

16.     For most of these pilots, the FAA's unusually lengthy review process for the Airbus A220s is the only thing that prevented them from completing training and flying in revenue service prior to the cut-off date.  It was not any fault on Breeze's part as to why these individuals had not been released to the line.  Breeze did not hire these pilots in any attempt to pad the list of eligible voters or otherwise influence the vote.  [Compl. ¶ 33.]

17.     As additional support for its argument that the 71 pilots are eligible employees in the craft or class, Breeze explained to the Board that all were performing work as Breeze pilots under the supervision of Breeze management, all had received and were subject to the Breeze Pilot Playbook, which sets forth the terms and conditions of the employer-employee relationship applicable to Breeze pilots, and all were being paid in the same manner as any other Breeze pilot under the terms of the Breeze Pilot Playbook.  [Compl. ¶ 34.]

18.     Alternatively, given the significant expansion in the craft or class before ALPA filed its application, which was a novel and unusual circumstance, and to protect the right of a majority of the craft or class of Flight Deck Crewmembers to select their representative, Breeze requested that the Board modify the eligibility cut-off date.  Breeze cited the Board's earlier cases to argue that the Board had previously modified the eligibility date to account for a significant change in the composition of the craft or class and to safeguard the right of the majority of a craft or class to decide who to represent them.  [Compl. ¶ 35.]

19.     Notably, Breeze did not ask the Board to change the cut-off date for the purpose of determining whether ALPA had met its threshold showing of support.  Rather, Breeze's request was limited to modifying the cut-off date to permit all 137 Flight Deck Crewmembers who were

employed as Breeze pilots on March 31, 2022, to participate in the election, should the Board authorize one.  [Compl. ¶ 36.]

20.      Fundamental to both of its requests, Breeze argued that by not including these 71 pilots in the election process, the Board would be allowing a union election to proceed among Breeze's pilots that would exclude a majority of Breeze's pilots from participating in that election. Breeze contended that it would be unfair to disenfranchise over 50% of its Flight Deck Crewmembers (71 out of 137) who possess a present interest in the craft or class, and that doing so would contradict the Board's statutory mandate to determine the representation wishes of a majority of the craft or class.  [Compl. ¶ 37.]

21.      ALPA opposed both Breeze's position that the 71 pilots were employees within the Flight Deck Crewmembers craft or class as of March 31, 2022, and properly included on the list, as well as Breeze's alternative request to adjust the cut-off date and permit all Flight Deck Crewmembers to have a voice in the representation election process.  **ALPA admitted, however, that holding the election without including those 71 pilots or modifying the eligibility cut-off date would mean that less than 50% of the craft or class of Breeze pilots would make the representation decision for all 137 Breeze pilots.**  [Compl. ¶ 38.]

22.      In rebuttal, on May 19, 2022, Breeze expounded on its argument that the 71 Breeze pilots were full-time employees within the Flight Deck Crewmembers craft or class as of the March 31, 2022 cut-off date.  Breeze contended that there is nothing in the RLA that states employees in training are not considered employees for purposes of the RLA.  *See* RLA Section 1, Fifth, 45 U.S.C. § 151, Fifth.  In support of this argument, Breeze pointed to the congressional intent behind the definition of employee and the RLA as a whole, along with court decisions interpreting the

RLA's definition of employee broadly.  Breeze argued that rather than applying a rigid, blanket exclusion of individuals in training when determining employees' eligibility to participate in an election, the Board must evaluate whether trainees are employees eligible to vote in a representation election on a case-by-case basis.  [Compl. ¶ 39.]

23.     As applied here, all 71 pilots were in the service of Breeze, performing work for Breeze, and subject to Breeze's continuing supervision and direction by the cut-off date.  The pilots were hired and being paid to perform work as Breeze pilots in the same manner as every other Breeze pilot, including those who were allowed to vote.  All were working under the supervision and direction of Breeze management.  Breeze directed and supervised these pilots on when, where, and how to complete their required training.  The 71 pilots were on the pilot seniority list, and they had received and were working under the provisions of the Breeze Pilot Playbook, which describes the terms and conditions of the employment relationship between Breeze and its employee pilots. In addition, as these 71 pilots were already performing work as Breeze pilots, they had an assurance of continued employment in the craft or class.  [Compl. ¶ 40.]

24.     Ultimately, Breeze asserted that excluding these 71 Breeze employee pilots from voting on the mere basis that they were still in training would disenfranchise a majority of Breeze's pilots from selecting a representative, contravening both the RLA's intent and statutory mandate under RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth.  [Compl. ¶ 41.]

**The Board Authorizes an Election Among a Clear Minority
of Breeze's Flight Deck Crewmembers**

25.     On June 8, 2022, the Board rejected Breeze's position that the 71 pilots were employees within the craft or class of Flight Deck Crewmembers properly included on the list and its alternative request to modify the eligibility cut-off date.  [Compl. ¶ 42 & Ex. 1 thereto.]

26.     Although the Board acknowledged that Breeze argued these pilots were employees within the craft or class based on the RLA's definition of employee and its application to the facts of the case, the Board declined to address those arguments.  [Compl. ¶ 43 & Ex. 1 thereto at 116.] Providing no factual or case specific analysis, the Board merely cited its prior decisions holding trainee employees are not eligible to vote unless they have performed line functions as of the cut-off date, and then held these 71 Breeze pilots were not eligible to vote.  [Compl. ¶ 43 & Ex. 1 thereto at 116-17.]

27.     As to Breeze's alternative request to modify the cut-off date to allow the 71 Breeze pilots to vote, the Board recognized that it previously had deviated from its cut-off date rule in "unusual or extraordinary circumstances," but determined that such circumstances were not present here.  [Compl. ¶ 44 & Ex. 1 thereto at 117.]

28.     On this basis, the Board then went further in stating that its decision to exclude the 71 Breeze pilots from participating in the election did not conflict with the Board's statutory mandate under RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth to ensure a "majority of any craft or class of employees shall have the right to determine who shall be the representative."  [Compl. ¶ 45 & Ex. 1 thereto at 117.]

29.     The Board authorized an election with only 66 eligible voters using the original cut-off date of March 31, 2022.  The voting period began on June 23, 2022, the date on which the Board mailed the ballots to the eligible Flight Deck Crewmembers, and concluded on August 11, 2022, the date on which the Board conducted the vote count.  [Compl. ¶ 47.]

30.     Following the Board's June 8, 2022 decision authorizing the election, the Board ruled on June 24, 2022, that one Flight Deck Crewmember on the eligibility list was no longer

eligible to vote and would be removed from the eligibility list, as he was no longer employed by Breeze.  [Compl. ¶ 48.]

31.     On August 4, 2022, Breeze informed the Board that six additional Flight Deck Crewmembers on the eligibility list were no longer eligible because they were no longer employed by Breeze.  In a ruling letter dated August 9, 2022, the Board agreed that these six individuals were no longer eligible to vote and would be removed from the eligibility list, leaving just 59 Flight Deck Crewmembers (out of the 131 Flight Deck Crewmembers still employed by Breeze) eligible to participate in the election.  [Compl. ¶ 48.]

**The Board Certifies ALPA as the Representative of Breeze Flight Deck Crewmembers**

32.     On August 11, 2022, the Board announced the results of the representation election by the Breeze Flight Deck Crewmembers deemed eligible to participate in the voting process.  Only 50 Flight Deck Crewmembers cast votes in the election.   Of those 50 Flight Deck Crewmembers, 29 voted in favor of representation, 20 voted against representation, and 1 voted for a write-in.  Based on the mere 29 votes for representation, the Board determined that ALPA received a majority of the valid votes cast and thus was certified as the representative of ***all*** Breeze Flight Deck Crewmembers under the RLA.  [Compl. ¶ 49 & Ex. 2 thereto.]

**Breeze Seeks Declaratory and Injunctive Relief**

33.     On August 12, 2022, Breeze filed its Complaint against the Board in this case seeking (a) a declaration that the Board's decision to conduct a union election in which a majority of Breeze's Flight Deck Crewmembers were precluded from participating constituted a gross violation of the RLA's majority participation requirement and the Board's obligation to conduct elections in compliance with the RLA; (b) a declaration that the Board's certification of ALPA as

the elected representative of Breeze's Flight Deck Crewmembers resulting from an election that did not include the right of a majority of the craft or class to participate is null and void and that Breeze has no obligation to negotiate with ALPA notwithstanding the certification issued by the Board; and (c) a mandatory injunction requiring the Board to conduct an election among Breeze's Flight Deck Crewmembers in a manner that complies with the Board's statutory obligation to determine the representation wishes of a majority of the craft or class.  [*See generally* Compl.]

## ARGUMENT

The Board incorrectly argues that this Court lacks subject matter jurisdiction to review the Board's determinations in this matter.  Tenth Circuit law is clear that "federal courts have … jurisdiction to review class determinations made by [the Board] pursuant to its certification of a bargaining representative [where] the complaining party shows on the face of the pleadings that the certification decision was a gross violation of the [RLA] …." *Kiamichi R. Co. v. Nat'l Mediation Bd.*, 986 F.2d 1341, 1343-44 (10th Cir. 1993) (internal quotations omitted).

This jurisdictional rule squarely applies here.  The RLA mandates that the "*majority* of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth (emphasis added).  This statutory guarantee is "established on the democratic theory that the majority of the craft or class of employees of the carrier should have authority to make agreements for the entire craft or class." *Del., Lackawanna & W. R.R. Co.*, 1 NMB 43, 48-49 (1937). Moreover, the Board must resolve disputes and conduct elections "in accordance with the requirements" of the RLA. RLA Section 2, Ninth, 45 U.S.C. § 152, Ninth.  The Board is therefore "bound by the law, and the law requires that a majority of the craft or class of employees on any

carrier shall have the right to determine who shall be the representative of the craft or class." *N.Y. Cent. R.R. Co.*, 1 NMB 303, 312 (1945).

Breeze's Complaint alleges facts that must be taken as true. *See Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009). These facts establish that the Board grossly violated its statutory obligation to conduct a union election among a majority of the craft or class of Breeze's Flight Deck Crewmembers by (1) applying an overly restrictive definition of a voter-eligible "employee" that appears nowhere in the RLA's plain and unambiguous definition of "employee"; or, in the alternative, (2) refusing to modify the eligibility cut-off date to satisfy the RLA's majority participation requirement and the Board's obligation to conduct elections in compliance with the RLA. As a result, subject matter jurisdictions exists, and Breeze has stated plausible claims for declaratory judgment and injunctive relief.

## I. The Board Grossly Violated the RLA by Excluding 71 Breeze Employees in Training from Voting in the Union Election.

The Board's decision grossly violates the RLA's majority participation requirement by refusing to recognize 71 full-time Breeze employees in training as voter-eligible "employees" under the RLA solely because they had not completed training and were not released to regular line service as of the March 31, 2022 cut-off date, which limitations appear nowhere in the RLA.

### A. The Board's Interpretation of "Employee" Is Contrary to the RLA.

The RLA broadly defines "employee" in clear language, in relevant part, as follows:

"The term 'employee' as used herein includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Surface Transportation Board . . .

The term 'employee' shall not include any individual while such individual is engaged in the physical operations consisting of the mining of coal, the preparation

14

of coal, the handling (other than movement by rail with standard railroad locomotives) of coal not beyond the mine tipple, or the loading of coal at the tipple."

RLA Section 1, 45 U.S.C. § 151, Fifth.

This definition of "employee" is used for purposes of the entire RLA and covers air carriers and their employees.  *See id.* RLA Section 1, Fifth, 45 U.S.C. § 151, RLA Section 201, 45 U.S.C. § 181; *see also Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 685 (1963) ("The 1936 amendments [to the RLA] made applicable to the airlines all of the provisions of the Railway Labor Act, excepting § 3, 45 U.S.C. § 153, dealing with the National Railroad Adjustment Board; but including § 1, 45 U.S.C. § 151, containing definitions ….").  Specific to air carriers, the RLA further defines an "employee" as "every air pilot or other person who performs any work as an employee … of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service."  RLA Section 201, 45 U.S.C. § 181.

Contrary to the Board's decision, this plain definitional language supports Breeze's position that the 71 pilots were employees within the craft or class as of March 31, 2022, and were therefore eligible to participate in an election if authorized.  "[T]he starting point in every case involving construction of a statute is the language itself." *Watt v. Alaska*, 451 U.S. 259, 265 (1981) (citations and internal quotations omitted).  Courts look "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  Where statutory language is plain and unambiguous, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted).

Here, the statutory language is unambiguous.  Looking at the RLA's plain language, the only individuals explicitly excluded from the RLA's definition of "employee" are those

individuals engaged in the mining, preparing, handling, and loading of coal. RLA Section 1, 45 U.S.C. § 151, Fifth. None of these exclusions applies here. The Board's interpretation that trainees are not employees has no foundation in the RLA.

Nor is there anything in the RLA, § 151, Fifth (or § 181) that supports a reading of anything other than covering all of a carrier's employees, except for those involved in certain coal operations. The language alone in § 151, Fifth confirms Congress' intent: employee means "every person in the service of a carrier … who performs any work defined as that of an employee." *Id.* § 151, Fifth. Considering this text, it necessarily follows that, when the RLA references **all** carrier employees, this is precisely what Congress meant. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." (internal quotations omitted)). *See also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("Absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.").

Indeed, the U.S. Supreme Court has stated that the term "employee" under the RLA should be broadly interpreted to fulfill the intent of Congress to regulate the entire employment relationship. *Pennsylvania R. Co. v. Day*, 360 U.S. 548 551-52 (1959). Similarly, the D.C. Circuit has explained that neither RLA, § 151, Fifth nor § 181 purport to speak exclusively regarding the definition of employee. *Pro. Cabin Crew Ass'n v. Nat'l Mediation Bd.*, 872 F.2d 456, 460 (D.C. Cir. 1989). *See also Nashville, C. & St. L. Ry. v. Railway Employees' Dep't*, 93 F.2d 340, 342 (6th Cir. 1937) (refusing to give RLA, § 151, Fifth a "narrow and too literal construction"). In fact, and in contrast to the National Labor Relations Act, the absence of any explicit inclusions or

16

limitations in the definition of employee under the RLA "may reasonably be interpreted as indicating a congressional desire for broader voter eligibility under the RLA." *Pro. Cabin Crew Ass'n*, 872 F.2d at 461.[1]

Moreover, to determine the congressional intent behind a definitional provision that applies throughout the RLA, courts look to the substance of the RLA as a whole. *See Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1051 (11th Cir. 1996). The RLA "is remedial and should be broadly and liberally construed to accomplish the purposes it was designed to meet." *McMullans v. Kansas, O. & G. Ry. Co.*, 229 F.2d 50, 55 (10th Cir. 1956). Section 151a of the RLA states that a central purpose of the RLA is "to forbid any limitation upon freedom of association among employees or any denial … of the right of employees to join a labor organization." RLA Section 1, First(a), 45 U.S.C. § 151a. "Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of the statutory scheme." *Texas & N.O.R. Co. v. Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 569 (1930).

Courts must also look to the facts of each case in determining whether a person is an employee eligible to vote under the RLA. *Edwards v. Southern Ry. Co.*, 258 F. Supp. 212, 216 (E.D.N.C. 1966). *Cf. USAir, Inc.*, 21 NMB 402, 406 (1994) (Board makes eligibility determinations based on all the facts and circumstances in each case and looks at the actual duties being performed by the employees at issue and not merely job titles and classifications); *Toledo,*

---

[1] Additionally, the National Labor Relations Board applies a community-of-interest test to determine whether the petitioned-for employees share a community of interest sufficiently distinct from employees excluded from the proposed unit, typically resulting in a bargaining unit that is site-specific. *PCC Structurals, Inc.*, 365 NLRB No. 160 (2017). Conversely, union representation of a craft or class under the RLA is for a carrier's entire transportation system (*i.e.*, an entire airline). RLA § 152, Fourth.

*Peoria & Western Railway Corp.*, 17 NMB 245, 248 (1990) (Board examines a number of facts in determining whether individuals are employees or management officials).

Based on these standards, the Board's decision to exclude the 71 Breeze pilots from voting in the union election grossly violates the RLA by applying a restricted definition of a voter-eligible "employee" that appears nowhere in the RLA's plain and unambiguous definition of "employee" and that vitiates Congress' intended broad judicial interpretation of the RLA in favor of freedom of choice in selecting union representatives. The Board determined—without analyzing the language of the statutory definition but, instead, relying solely on an extra-statutory distinction that the Board made up and followed in prior Board cases—that employees in training are not considered employees under the RLA.  [Ex. 2. to Compl. at 116-17.]  On this basis, the Board would force the unionization of more than 131 Breeze pilots based on the affirmative votes of a mere 29 pilots.[2]

*Nothing* in the RLA's definition of "employee" reflects any such distinction.  The Board lacks authority to act contrary to the RLA's specific language, including by substituting its own narrowed definition of "employee" for the statutory definition.  *See CSX Transp., Inc. v. Nat'l Mediation Bd.*, No. CIV.A 04-0611 (RWR), 2005 WL 2297554, at *8 (D.D.C. Aug. 29, 2005) (unpublished) (stating that "Congress effectively has provided a 'who, what, when, and how' laundry list governing the [Board's] authority," and holding that the Board's decision grossly

---

[2] The vote was determined based on a majority of votes cast, not by a majority of Breeze Pilots eligible to vote.  In 2010, the Board abandoned the voting process that had been in place for 75 years which required a majority of eligible voters in the relevant craft or class to affirmatively vote for union representation.  Under the revised Board process, a majority of the votes cast is sufficient to elect union representation even if it is less than a majority of the eligible voters.  *Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476 (D.C. Cir. 2011).

violated the RLA by conflicting with "Congress' precise language").  Only Congress can modify

the RLA's definition of "employee."  Because Congress did not codify an exclusion for trainees

into that definition, the Board grossly violated the RLA by applying a blanket exclusion of

individuals in training when determining employees' eligibility to participate in a union election.

Instead, the assessment of whether trainees are employees eligible to vote in a representation

election must be evaluated by applying the RLA's actual definition of "employee" to the specific

facts of the case.[3]

As applied here, the 71 Breeze pilots whom the Board excluded from voting were properly

classified by Breeze as full-time employees as of the March 31, 2022 cut-off date.  All 71 pilots

were in the service of Breeze, performing work for Breeze, and subject to Breeze's continuing

supervision and direction by the cut-off.  The excluded pilots were hired, issued employee

identification cards, and paid to perform work as Breeze pilots in the same manner as every other

Breeze pilot.  All were working under the supervision and direction of Breeze management.

Breeze directed and supervised these pilots on when, where, and how to complete their required

training in preparation for their flying revenue service.  The 71 excluded pilots were on the pilot

seniority list.  They had received and were working under the provisions of the Breeze Pilot

Playbook, which describes the terms and conditions of the employee-employer relationship

between Breeze and its employee pilots.  And because the 71 pilots already were performing work

---

[3] The Board incorrectly argues that "[t]he RLA … provides that further interpretation [of the RLA's definition of 'employee'] is left to the discretion of the Board," citing *Kiamichi R. Co. v. Nat'l Mediation Bd.*, 986 F.2d 1341, 1343 (10th Cir. 1993), for the proposition that "'[t]he power to resolve disputes concerning class or craft designations belongs to the NMB.'"  [Board's Motion at 3 & n.11.]  Nothing in the RLA nor in *Kiamichi* confers on the Board any discretion to supplant the RLA's definition of "employee" with the Board's own, narrowed definition.

as Breeze pilots, they had an assurance of continued employment in the craft or class.  [Compl. ¶ 40.]

Notably, the 71 pilots all were hired as full-time Breeze pilots some months *before* ALPA filed its application with the Board in April 2022, as part of Breeze's rapid expansion plan. [Compl. ¶ 32.]  For most of these pilots, the FAA's unusually lengthy review process for the Airbus A220s is the only thing that prevented them from completing training and flying in revenue service prior to the cut-off date.  It was a matter of the FAA's delayed review process as to why these individuals had not been released to the line.  Breeze did not hire these pilots in any attempt to pad the list of eligible voters or otherwise influence the vote.  [Compl. ¶ 33.]

For these reasons, the 71 Breeze pilots more than satisfied the RLA's definition of an "employee" as an individual who performs work in the service of a carrier and who is subject to the carrier's continuing authority to supervise and direct the manner of rendition of his service. *See* 45 U.S.C. §§ 151, 181.  The Board grossly violated the RLA by concluding otherwise based on the Board's own substitute definition of an employee under the RLA that unconditionally excludes all trainees—regardless of facts that overwhelmingly validate their status as legitimate full-time pilot employees—from voting in a union election.  This, in turn, resulted in the Board grossly violating the majority participation requirement of RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth by disenfranchising a majority of Breeze's pilots (71 out of 137) with a present interest in the craft or class from selecting a union representative.  [Compl. ¶¶ 37-38, 41.]

### B.    The Board's and ALPA's Reliance on *United Air Lines* and *Eastern Air Lines* Is Misplaced.

In arguing otherwise, the Board and ALPA assert that the Board's extra-statutory distinction that trainees are not voter-eligible employees under the RLA is supported by two cases,

*ALPA v. United Air Lines, Inc.*, 802 F.2d 886, 913 (7th Cir. 1986), and *Eastern Air Lines, Inc. v. ALPA*, 920 F.2d 722, 726 (11th Cir. 1990); and by the prior Board decisions cited in the Board's decision here.  [*See* Ex. 2 to Compl. at 116.]  None of these arguments is availing.

First, both *United Air Lines* and *Eastern Air Lines* are out-of-jurisdiction cases and, as explained below, are inapposite in any event.  The Tenth Circuit has not yet addressed whether the Board grossly violates the RLA by applying a blanket exclusion of individuals in training when determining their eligibility to participate in a union election.  This Court has the opportunity and the obligation to evaluate this issue of first impression in this circuit independently by applying governing statutory interpretation principles to the plain language of the RLA's definition of an "employee," consistent with Congress' intended broad judicial interpretation of that definition.

Second, both *United Air Lines* and *Eastern Air Lines* are factually distinguishable from this case.  In *United Air Lines*, the Seventh Circuit determined that newly hired pilots were not employees of an airline upon their first day of training under the RLA where—unlike the 71 Breeze pilots at issue here—the pilots were not paid a salary during training and the pilots' training agreement expressly stated that a student pilot was not an employee during training.  802 F.2d at 892, 911-13.  While the Seventh Circuit stated in *dicta* that "trainees … simply do not fall within the RLA's definition of employee," that *dicta* must be read in context with and limited by the court's actual holding:  "We conclude that unless a person has performed services for the employer under that employer's supervision he is not an employee for purposes of the RLA."  *Id.* at 913.  Thus, the Seventh Circuit—unlike the Board here—did not follow any blanket rule that trainees can never be employees under the RLA.  Rather, trainees can be employees under the RLA if they have performed services for the employer under the employer's supervision.  Such holding is fully

consistent with the RLA's definition of "employee," and exactly the situation here.  Unlike the trainee pilots in *United Airlines*, all 71 of the Breeze trainee pilots had performed work for Breeze under Breeze's supervision by the cut-off date.  [Compl. ¶ 40.]

Similarly, in *Eastern Air Lines*, the Eleventh Circuit concluded that new-hire pilots who had been hired to fill vacant positions caused by a strike but had not completed training before the end of the strike were not permanent replacement employees under the RLA and were subject to displacement by returning striking pilots.  920 F.2d at 727-29.  No such facts are present here. Moreover, although the Eleventh Circuit purported to follow *United Air Lines*' reasoning that "'unless a person has performed services for the employer under that employer's supervision he is not an employee for purposes of the RLA,'" the court held that "Eastern's new hire trainee pilots did not obtain the status of 'permanent employees'" because "the trainees were not qualified to perform the work Eastern's pilots ***ordinarily discharged***," which "under FAA guidelines … required … complet[ing] a series of FAA examinations and obtaining an FAA pilot certificate before operating on Easten's regular revenue flights." *Id.* at 727-28 (emphasis added).  *United Air Lines* imposed no such "ordinarily discharged" limitation on the services performed for the individual to qualify as an employee under the RLA.  Nor, more importantly, does the RLA's definition of "employee" contain any such limitation.  RLA Section 1, Fifth, 45 U.S.C. § 151, RLA Section 201, 45 U.S.C. § 181.

Instead, the RLA plainly and unambiguously defines "employee" as a person "who performs ***any*** work" as an employee of the employer, "subject to its or their continuing authority to supervise and direct the manner of rendition of his service." *Id.* (emphasis added).  Here, all 71 of the Breeze pilots at issue satisfy that definition because they were in the service of Breeze,

performing work for Breeze, and subject to Breeze's continuing supervision and direction by the cut-off. [Compl. ¶ 40.] Simply stated, Congress meant what it said in codifying "any work" in the statutory definition. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (statutory interpretation requires presuming Congress meant what it said in statute). The *Eastern Air Lines* court had no valid power to read those words out of the definition and impose a judicial definition that significantly and arbitrarily restricts the scope of "any work" to work performed by a pilot only after full FAA certification. Because the statute contains no such restriction, even if *Eastern Air Lines* were controlling (which it is not), and even if it were not factually distinguishable (which it is), it was incorrectly decided and this Court should decline to follow it on that basis.[4]

Third, that the Board applied an extra-statutory distinction (i.e., that employees in training are never considered employees under the RLA) that the Board developed and followed in the Board cases cited in the Board's decision here provides no valid support for the Board's position. [*See* Ex. 2 to Compl. at 116.] As explained above, the Board lacks authority to act contrary to the RLA's specific language, including by substituting its own narrowed definition of "employee" for the statutory definition. Because Congress did not codify an exclusion for trainees into that

---

[4] Also misplaced is ALPA's reliance on *Independent Federation of Flight Attendants v. Trans World Airlines, Inc.,* 819 F.2d 839 (8th Cir. 1987), *rev'd on other grounds,* 489 U.S. 426 (1989), on which *Eastern Air Lines* relied in part. [ALPA Motion at 9-10.] *Trans World*, following its reversal, is not good law and, for that reason alone, fails to provide any legitimate support to ALPA's position. Further, like *Eastern Air Lines*, it addressed the factually distinguishable context of newly hired trainee replacements for striking employees. 819 F.2d at 841, 845-46. And, in any event, *Trans World*'s holding—that because "the trainees … never performed any services for [the carrier] under its supervision prior to the Union's offer to return to work … they c[ould] not be considered employees within the meaning of the RLA," 819 F.2d at 846-47—is inapposite because, as explained above, all 71 of the Breeze trainee pilots ***had*** performed work for Breeze under Breeze's supervision by the cut-off date. [Compl. ¶ 40.]

definition, to the extent that the cited Board precedent likewise applied a blanket exclusion of individuals in training when determining employees' eligibility to participate in a union election, such precedent equally constitutes a gross violation of the RLA.

Significantly, the cited Board cases contain little to no analysis regarding the basis for the Board's ruling that trainee employees are not eligible. Instead, they merely cite the Board's prior rulings as support and then rotely adopt the same conclusion. *See Delta Air Lines*, 35 NMB 173, 177 (2008) ("The Board has long held that individuals that have completed their IOE [Initial Operating Experience] have performed line functions and are eligible to vote."); *ExecutiveJet Aviation, Inc.*, 28 NMB 467, 469 (2001) (stating that "[t]he Board consistently requires evidence of performance of line functions in the craft or class to establish voter eligibility," and concluding that the individuals at issue were ineligible because they did not perform line functions as flight attendants as of the cut-off date); *Simmons Airlines*, 15 NMB 228, 230 (1988) ("In several recent decisions, the Board has held that trainee flight attendants are not eligible."). The Board's prior rulings are as inconsistent with the RLA's text as the Board's decision here.

Nor, in any event, do any of the Board cases cited in the Board's decision here address the eligibility of trainee pilots. *See Delta Air Lines*, 35 NMB 173 (flight attendants); *ExecutiveJet Aviation, Inc.*, 28 NMB 467 (flight attendants); *United Air Lines*, 18 NMB 181 (1994) (passenger service employees); *AmericaWest Airlines*, 16 NMB 135 (1989) (flight attendants); *Simmons Airlines*, 15 NMB 228 (flight attendants). Also, in some of this authority, the Board was clear that its ruling was limited to the eligibility of individuals in the specific craft or classes at issue. *See AmericaWest Airlines*, 16 NMB at 144 ("Until individuals training for *in-flight functions* have successfully completed their IOE [Initial Operating Experience], they have not performed line

functions and therefore are not eligible.") (emphasis added)).  The distinctions between pilots and

flight attendants are numerous.  Relevant here, pilot training is vastly different than flight attendant

training in terms of both its overall length of time to complete and its extensive federally mandated

requirements.  Accordingly, the Board's cited precedent is factually distinguishable.

For all these reasons, the Board grossly violated the majority participation requirement of

RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth by applying a restricted definition of a voter-

eligible "employee" that appears nowhere in the RLA's plain and unambiguous definition of

"employee" to disenfranchise a majority of Breeze's pilots (71 out of 137) with a present interest

in the craft or class from selecting a union representative.  As a result, subject matter jurisdiction

exists, and Breeze has stated plausible claims for declaratory judgment and injunctive relief.

## II.      The Board Grossly Violated the RLA by Refusing to Modify the Eligibility Cut-Off Date to Satisfy the RLA's Majority Participation Requirement.

Even if this Court were to conclude that the Board did not grossly violate the RLA's

majority participation requirement by applying a restricted definition of a voter-eligible employee,

the allegations in Breeze's Complaint independently establish subject matter jurisdiction under

Rule 12(b)(1) and satisfy Rule 12(b)(6)'s pleading standards because the Board's decision grossly

violates the RLA's majority participation requirement under RLA Section 2, Fourth, 45 U.S.C.

§ 152, Fourth by refusing to modify the cut-off date to permit all 137 Flight Deck Crewmembers

to participate in the election.  This deprived a significant majority of Breeze's Flight Deck

Crewmembers of their right to participate in the voting process, and improperly forces Breeze to

negotiate with ALPA, a union that was not elected through a process in which a majority of its

Flight Deck Crewmembers were permitted to participate.

"The Board has declined to change the cut-off date where a majority of the craft or class remains eligible to vote," *Norwegian Air Shuttle ASA*, 43 NMB 140, 143 (2016), on the basis that fixing the cut-off date at the commencement of the investigation insulates the representation process from manipulation by either side in order to gain an advantage with respect to the showing of interest or election results. *Continental Airlines, Inc.*, 24 NMB 196 (1997); *USAir, Inc.*, 24 NMB 38 (1996). Nevertheless, the Board previously has modified the default eligibility cut-off date based on what it deems "extraordinary or unusual circumstances," including when there has been a substantial change in the composition of the craft or class. *See Compass Airlines*, 35 NMB 14, 21 (2007) ("The Board has recognized that substantial turn-over of employees in the craft or class is an extraordinary or unusual circumstance that warrants modifying the cut-off date."); *USAir*, 10 NMB 495 (1983) (modifying the cut-off date where following the "Board's normal procedures" would result in "less than a majority of the craft or class [being] eligible to vote"); *Piedmont Airlines*, 9 NMB 41, 45 (1981) (revising cut-off date by almost five years in light of turnover of more than half the craft or class).

Here, the Board grossly erred by failing to modify the cut-off date under these standards because, contrary to the RLA's majority participation mandate, such refusal resulted in less than a majority of the craft or class being eligible to vote. This is illustrated by *Compass*, where the Board changed a cut-off date by two-and-a-half months because the craft or class at a start-up airline more than tripled between when the union filed its application and when the Board authorized the election. In accordance with the RLA's requirement that a majority of the craft or class remain eligible to vote, the Board modified the cut-off date to account for the airline's recent

hires, preventing the type of situation present in this case where "significantly less than a majority of the craft or class will be eligible to vote."  35 NMB at 21.

These same principles apply here.  Compass, like Breeze [*see* Compl. ¶¶ 21-28], was a start-up carrier that had experienced substantial growth in a short time period, such that a majority of the craft or class would have been disenfranchised in an election using the original cut-off date. Despite the similarities and the evidence submitted by Breeze that all 137 Breeze Flight Deck Crewmembers were hired as full-time pilots *before* ALP filed its petition, and therefore were not hired in any attempt to pad the list of eligible voters, the Board inexplicably concluded that it would not follow *Compass* because that decision was not intended to be precedential.  [*See* Ex. 2 to Compl. at 118.]

In doing so and incorrectly asserting that its decision to exclude the 71 Breeze pilots from participating in the election did not conflict with the Board's statutory mandate under RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth to ensure that a "majority of any craft or class of employees shall have the right to determine who shall be the representative," [Ex. 2 to Compl. at 118], the Board significantly misread and thereby grossly violated its statutory mandate.  The Board inexplicably claimed that all RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth requires is that a "majority of valid votes cast by employees determined by the Board to be eligible to participate in the election will determine the representation question."  [*See* Ex. 2 to Compl. at 118.]  However, the Board's statement grossly overlooks the plain requirement under RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth that a majority of employees within the craft or class must be able to participate in the election in the first place and is in direct conflict with the pilots' right to decide whether to be represented by a union for purposes of collective bargaining.

27

Accordingly, the allegations in Breeze's Complaint independently satisfy Rules 12(b)(1) and 12(b)(6) because the Board grossly violated the RLA's majority participation requirement by refusing to modify the cut-off date to permit all 137 Flight Deck Crewmembers to participate in the election, thereby unfairly and erroneously disenfranchising a significant majority of them from voting in the union election.

<b><u>CONCLUSION</u></b>

For all the foregoing reasons, Breeze respectfully requests that this Court deny the Board's and ALPA's Motions.

RESPECTFULLY SUBMITTED this 16th day of December, 2022.

PARR BROWN GEE & LOVELESS, P.C.

/s/ Cheylynn Hayman
Jonathan O. Hafen
Cheylynn Hayman

Attorneys for Plaintiff Breeze Aviation Group, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 16th day of December, 2022, I filed the foregoing **COMBINED RESPONSE TO MOTIONS TO DISMISS FILED BY DEFENDANT NATIONAL MEDIATION BOARD AND INTERVENOR AIR LINE PILOTS ASSOCIATION, INTERNATIONAL** via CM/ECF, which electronically served all counsel of record in this case.

/s/ Cheylynn Hayman