IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BREEZE AVIATION GROUP, INC., <br><br> Plaintiff, <br> v. <br><br> NATIONAL MEDIATION BOARD, <br><br> Defendant, <br><br> and <br><br> AIR LINE PILOTS ASSOCIATION, INT'L, <br><br> Defendant-Intervenor. | **ORDER GRANTING DEFENDANT NATIONAL MEDIATION BOARD'S MOTION TO DISMISS (ECF NO. 28); DENYING ALPA'S MOTION TO DISMISS (ECF NO. 33) AS MOOT** <br><br><br><br> Case No. 2:22-cv-00514-TC-JCB <br><br> District Judge Tena Campbell <br> Magistrate Judge Jared C. Bennett |

Plaintiff Breeze Aviation Group, Inc. (Breeze) is a start-up airline.  Compl. ¶ 21, ECF No. 2.  In 2022, Defendant National Mediation Board (the Board or NMB) oversaw a representation election among Breeze's Flight Deck Crewmembers.[1]  Id. ¶¶ 29–52.  Following the election, the Board certified Defendant-Intervenor Air Line Pilots Association (ALPA) as Breeze's pilots' representative.  Id. ¶ 49.  In its complaint, Breeze challenges the certification decision, arguing it was a gross violation of the Railway Labor Act (RLA).  The Board and ALPA have moved to dismiss Breeze's complaint.  Board Mot. Dismiss, ECF No. 28; ALPA Mot. Dismiss, ECF No. 33.  For the reasons discussed below, the court grants the Board's Motion to Dismiss.

I.   **Background**

   a.  **The Process of Certifying a Craft or Class Representative.**

Breeze is a common carrier by air within the meaning of RLA Section 201, 45 U.S.C. § 181.  Compl. ¶ 2, ECF No. 2.  Accordingly, this case implicates the RLA, which governs labor

---

[1] Breeze calls its pilots "Flight Deck Crewmembers."  See, e.g., id. ¶ 30.

relations in the airline and rail industries.  Id. ¶ 6.  The RLA protects the rights of airline and rail employees "to organize and bargain collectively through representatives of their own choosing." Id. (quoting 45 U.S.C. § 152, Fourth).  The Board "is an independent U.S. federal government agency that facilitates labor-management relations within the nation's railroad and airline industries."  Id. ¶ 3.  One of its responsibilities is "'effectuating employee rights of self-organization where a dispute exists' in compliance with the RLA."  Id. (quoting NMB, Overview & FAQ, https://nmb.gov/NMB_ Application/index.php/overview-faq).  The RLA empowers the Board "to conduct majoritarian elections among airline and railway employees 'to determine who shall be the representative of the [employee] craft or class' for purposes of collective bargaining."  Id. ¶ 3 (quoting 45 U.S.C. § 152, Fourth).

A group of airline employees is a "craft or class."[2]  As summarized in Breeze's complaint, a union seeking to represent a craft or class of airline employees begins the process by filing an application requesting that the Board conduct an election among the members of the craft or class.  Id. ¶ 7 (citing 29 C.F.R. § 1203.2).  "The RLA requires that the union's application be supported by a showing of interest from at least 50% of the craft or class."  Id. (citing 45 U.S.C. § 152, Twelfth; 29 C.F.R. § 1206.2).  To establish this showing of interest, "the union submits signed employee 'authorization cards' to the Board with its application."  Id. ¶ 8 (citing 29 C.F.R. §§ 1203.2, 1206.2).  "If the union fails to meet the necessary showing of interest, the Board dismisses the union's application."  Id.

If the application is supported by the required interest, "the Board conducts an election to determine whether the employees within the craft or class desire to be represented by the

---

[2] "Craft or class is a term used for the group of employees the applicant seeks to represent." NMB, Overview & FAQ, https://nmb.gov/NMB_Application/index.php/overview-faq.

applicant union, by some other union, or to remain unrepresented." <u>Id.</u>  The RLA requires that a "<u>majority</u> of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." <u>Id.</u> ¶ 9 (quoting 45 U.S.C. § 152, Fourth) (emphasis added by Breeze in its Complaint).

In addition to the RLA's directives, the Board sets out rules regarding representation elections and employee eligibility to participate in such elections in its Representation Manual. <u>Id.</u> ¶ 16.  Relevant here, the Manual establishes "that to be eligible to participate in an election, an employee must have an employee-employer relationship with the airline as of the eligibility 'cut-off date,' which is generally the last day of the last payroll period ending before the day on which the Board received the union's application." <u>Id.</u> (citing Representation Manual §§ 2.3, 2.4 (2022)).  The Manual also "provides that '[a]ll individuals working regularly in the craft or class on and after the cut-off date are eligible to vote in an NMB representation election.'" <u>Id.</u> (quoting Representation Manual § 9.2 (2022)).  This means employees hired after the cut-off date typically cannot participate in the election, but the Board can modify the default eligibility cut-off date if it finds "extraordinary or unusual circumstances" are present.  <u>See</u> <u>id.</u> ¶¶ 16–20.

### b.  The Challenged Representation Election.

Under the process outlined above, on April 6, 2022, ALPA filed an application with the Board seeking a representation election among Breeze's Flight Deck Crewmembers.  <u>Id.</u> ¶ 29.  "In its application, ALPA stated that there were 69 Breeze employees in the craft or class."  <u>Id.</u>  The last day of the last payroll period ending before the day on which the Board received ALPA's application was March 31, 2022, consequently, that date is the eligibility cut-off date for the election.  <u>Id.</u> ¶ 25.  By the cut-off date, the airline "had hired 137 Flight Deck Crewmembers (Pilots), all of which were actively on the Company's payroll."  <u>Id.</u>  Reflecting this, following

ALPA's application to the Board, Breeze gave the Board a list of the 137 pilots it had "an employee-employer relationship" with as of the cut-off date.  Id. ¶ 30.  All 137 "were employed as full-time pilots" at that time.  Id. ¶ 30; see id. ¶ 39.

Of these 137 individuals, 71 "had not completed training and were not released to regular line service" before the cut-off date.  Id. ¶ 31.[3]  In its Complaint, Breeze goes into detail about the status of the 71 Trainee Pilots as of the cut-off date.  They were "hired as full-time Breeze pilots before ALPA filed its application with the Board in April 2022."  Id. ¶ 32.  They "were performing work as Breeze pilots under the supervision of Breeze management, all had received and were subject to the Breeze Pilot Playbook, which sets forth the terms and conditions of the employer-employee relationship applicable to Breeze pilots, and all were being paid in the same manner as any other Breeze pilot under the terms of the Breeze Pilot Playbook."  Id. ¶ 34.  And,

> all 71 pilots were in the service of Breeze, performing work for Breeze, and subject to Breeze's continuing supervision and direction. . . .  Specifically, the pilots were hired and being paid to perform work as Breeze pilots in the same manner as every other Breeze pilot.  All were working under the supervision and direction of Breeze management.  Breeze directed and supervised these pilots on when, where, and how to complete their required training.  Also, the 71 pilots were on the pilot seniority list. . . .  In addition, as these 71 pilots were already performing work as Breeze pilots, they had an assurance of continued employment in the craft or class.

Id. ¶ 40.  During the May 9, 2023 hearing on the motions to dismiss, counsel for Breeze elaborated on the work these 71 Trainee Pilots were doing before the cut-off date: they attended flight school, provided services by way of their work on simulators, and were preparing to fly. Breeze's counsel noted that these 71 Trainee Pilots were not first-time flyers, rather, they each had thousands of hours of flying experience.  "[F]or most of" the 71 Trainee Pilots, the "only

---

[3] To put these numbers into context, Breeze hired eight pilots in 2020, 68 in 2021, and 64 in the first three months of 2022.  Id. ¶ 24.  By August 11, 2022 (the date the Board announced the representation election results), Breeze employed 260 pilots, and, when the complaint was filed on August 12, 2022, Breeze anticipated employing over 300 pilots by the end of 2022.  Id. ¶ 25.

thing that prevented them from completing training and flying in revenue service prior to the cut-off date" was "the FAA's unusually lengthy review process for the Airbus A220s."  Id. ¶ 33.[4]

"Following Breeze's submission[ of the list that contained the 137 pilots with an employee-employer relationship as of the cut-off date], ALPA filed challenges and objections" to Breeze's list.  Id. ¶ 31.  Relevant here, "ALPA challenged the inclusion of the 71 pilots who had not completed training and were not released to regular line service before" the cut-off date.  Id.  In response, Breeze asked "the Board to find the 71 pilots were employees within the craft or class of [pilots] properly included on the list."  Id. ¶ 32.  "Alternatively, in light of the significant expansion in the craft or class prior to when ALPA filed its application, which [Breeze asserts] was a novel and unusual circumstance . . . Breeze requested that the Board modify the eligibility cut-off date."  Id. ¶ 35.  It requested this change "to permit all 137 [pilots] who were employed as Breeze pilots on March 31, 2022 to participate in the election, should the Board authorize one."  Id. ¶ 36.  Specifically, Breeze requested the cut-off date "be modified from March 31, 2022 to September 30, 2022 in order to permit the Pilot Trainees to vote."  Breeze Aviation Group, Inc., 49 NMB 112, 117 (2022) (Ex. 1 to Compl., ECF No. 2-1); see also Reply Supp. Board Mot. Dismiss 6 n.32, ECF No. 39 (citing Breeze Aviation, 49 NMB at 117) ("[Breeze] asked the Board

---

[4] Breeze explains the connection between the Trainee Pilots and the A220 review delays in detail. Breeze notes it "hired these pilots with the plan that they would have completed training and been ready to fly the A220 aircraft once th[e planes] were delivered.  However, [a] several months' long delay in the FAA certification process of the A220s created a bottleneck and caused most of the 71 pilots to delay completion of their training.  Most of the pilots who were being trained on the A220s were unable to complete training and fly the A220s in revenue service due to the abnormally lengthy FAA review process."  Id. ¶ 28.  Before Breeze was able to fly the A220s in revenue service, it also needed to complete Proving Test Flights.  These flights were originally planned to be completed by March 15, 2022, but due to the FAA's delays Breeze was not able to begin Proving Test flights until May 9, 2022.  Id.  The Proving Test flights were not the end of the A220s' certification process, the FAA needed "time to complete administrative functions prior to certifying the A220s, after which the aircraft [were] placed in revenue service."  Id.  "The first Breeze A220 flight was operated in revenue service on May 25, 2022."  Id.

to extend the cut-off date to September 30, 2022—almost five months into the future—to allow its trainee pilots to graduate."). ALPA opposed both requests. Compl. ¶ 38, ECF No. 2.

"[T]he Board rejected Breeze's position that the 71 pilots were employees within the craft or class of [pilots] properly included on the list and its alternative request to modify the eligibility cut-off date." Id. ¶ 42 (citing Breeze Aviation, 49 NMB 112). About moving the cut-off date, it found "unusual or extraordinary circumstances" were not present. Id. ¶ 44. The Board instead "authorized an election with only 66 eligible voters using the original cut-off date of March 31, 2022." Id. ¶ 47. Ultimately, 59 pilots were deemed eligible to participate. Id. ¶ 48. Of those, 50 voted: 29 voted in favor of representation, 20 against, and 1 voted for a write-in. Id. ¶ 49. Based on the 29 votes for representation, the Board determined ALPA received a majority of the valid votes cast and ALPA was certified as the representative of all Breeze Flight Deck Crewmembers under the RLA. Id. (citing NMB Certification (Ex. 2 to Compl., ECF No. 2-2)).

### c. Breeze's Complaint Against the Board.

Following the Board's certification decision, Breeze filed its complaint in this lawsuit. Breeze alleges that the Board's certification decision grossly violated the RLA in two ways. First, by "applying an overly restrictive definition of a voter-eligible 'employee' that appears nowhere in the RLA's plain and unambiguous definition of 'employee.'" Opp. Mots. Dismiss 14, ECF No 37; Compl. ¶ 50, ECF No. 2 ("the Board grossly erred by failing to recognize the 71 pilots as employees within the Flight Deck Crewmembers craft or class as of March 31, 2022."). Second, by "refusing to modify the eligibility cut-off date to satisfy the RLA's majority participation requirement and the Board's obligation to conduct elections in compliance with the RLA." Opp. Mots. Dismiss 14, ECF No 37; Compl. ¶ 50, ECF No. 2 ("the Board grossly erred by refusing to modify the cut-off date to permit all 137 Flight Deck Crewmembers to participate

in the election."). Breeze says these "gross violations" deprive its pilots of "their right to participate in the voting process," and "improperly forc[e] Breeze to negotiate with ALPA, a union that was not elected through a process in which a majority of [Breeze's] Flight Deck Crewmembers were permitted to participate." Compl. ¶ 50, ECF No. 2.

Breeze asks for declaratory and injunctive relief. First, it asks for a "declaration that the Board's decision to conduct a union election in which a majority of Breeze's [pilots] were precluded from participating constituted a gross violation of the RLA's majority participation requirement and the Board's obligation to conduct elections in compliance with the RLA." Id. ¶ (a). Second, for a "declaration that the Board's certification of ALPA as the elected representative of Breeze's [pilots] . . . is null and void and that Breeze has no obligation to negotiate with ALPA notwithstanding the [Board's] certification." Id. ¶ (b). Third, for a "mandatory injunction requiring the Board to conduct an election among Breeze's [pilots] in a manner that complies with the Board's statutory obligation to determine the representation wishes of a majority of the craft or class." Id. ¶ (c); see also id. ¶ (d) (requesting other relief).

### d. The Pending Motions to Dismiss.

The Board and ALPA each filed a motion to dismiss Breeze's complaint. The Board moves to dismiss without prejudice under Fed. R. Civ. P. 12(b)(1). Board Mot. Dismiss, ECF No. 28. ALPA moves to dismiss with prejudice under Fed. R. Civ. P. 12(b)(6). ALPA Mot. Dismiss, ECF No. 33. Breeze opposes both motions. Opp. Mots. Dismiss, ECF No. 37.

"A Rule 12(b)(1) motion to dismiss requires a court to 'address jurisdiction issues at the beginning of [the] case and, if jurisdiction is lacking, dismiss the case immediately.'" Shelton v. Chipotle Mexican Grill, Inc., No. 1:17CV103, 2018 WL 456200, at *1 (D. Utah Jan. 17, 2018) (unpublished) (quoting In re Franklin Sav. Corp., 385 F.3d 1279, 1286 (10th Cir. 2004))

(deciding Rule 12(b)(1) issue before assessing Rule 12(b)(6) argument, where defendant moved to dismiss under both sections of Rule 12(b)).[5]  Accordingly, the court begins with the Board's motion to dismiss, which argues the court lacks jurisdiction to review its certification decision.

## II.   The Board's Motion to Dismiss Under Rule 12(b)(1)

The Board seeks to dismiss Breeze's complaint under Rule 12(b)(1).  It argues that judicial review of the Board is confined to cases where the complaint shows a "gross violation" of the RLA and Breeze has not shown such a violation, so dismissal is appropriate because the court cannot review the challenged Board decisions.  Board Mot. Dismiss 1–2, ECF No. 28 (citing 45 U.S.C. §§ 151, 181); Reply Supp. Board Mot. Dismiss 1, ECF No. 39.  After a peek at the merits of Breeze's case, the court finds that it does not have jurisdiction to review the challenged Board actions.

### a.  Legal Standard.

The court is constrained in its ability to review the Board's actions.  "[J]udicial review of NMB actions [i]s 'one of the narrowest known to the law.'"  Kiamichi R. Co. v. Nat'l Mediation Bd., 986 F.2d 1341, 1343 (10th Cir. 1993) (citing Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines, Inc., 839 F.2d 809, 811 (D.C. Cir.), cert. denied, 488 U.S. 820 (1988).  Federal courts "lack jurisdiction to review class determinations made by NMB pursuant to its certification of a bargaining representative unless the complaining party shows 'on the face of the pleadings that the certification decision was a gross violation of the [RLA] or that it violated the constitutional rights of an employer, employee, or Union.'"  Id. at 1343–44 (quoting Trans World Airlines, 839 F.2d 809).  Breeze has not alleged a constitutional violation, at issue is only whether the Board's certification decision was a gross violation of the RLA.

---

[5] Unpublished decisions are cited for persuasive value.  Fed. R. App. 32.1; DUCivR 7-2(a)(2).

"Courts take only a 'peek at the merits' to determine if the NMB has committed a[] . . . gross violation of the statute.'" Pro. Cabin Crew Ass'n v. Nat'l Mediation Bd., 872 F.2d 456, 459 (D.C. Cir. 1989) (quoting Int'l Bhd. of Teamsters v. Bhd. of Ry., Airline & S.S. Clerks, 402 F.2d 196, 205 (D.C. Cir.), cert. denied sub nom. Bhd. of Ry., Airline & S.S. Clerks v. Nat'l Mediation Bd., 393 U.S. 848 (1968)).  They are not empowered to proceed further unless the "peek" reveals an error that is obvious on the face of the papers, without extension to arguing in terms of policy and generalities about what the RLA should provide.  Id.; see also Am. W. Airlines, Inc. v. Nat'l Mediation Bd., 119 F.3d 772, 775 (9th Cir. 1997) (quoting Bhd. of Ry. & S.S. Clerks v. Ass'n for the Benefit of Non–Contract Emps., 380 U.S. 650, 671 (1965)) ("Permitting a full review of the merits in order to determine jurisdiction would defeat Congress' intent 'to avoid the haggling and delays of litigation.'  Allowing a 'peek' at the merits enables a court to determine if the NMB has committed a gross violation of the RLA without causing undue delay.").

**b.   Analysis.**

To determine if it is obvious on the face of the papers that the Board grossly violated the RLA, the court "peeks" at the merits of Breeze's case.  If it is not obvious that the Board grossly violated the RLA by excluding Breeze's Trainee Pilots from the craft or class of employees eligible to vote in the representation election or by refusing to move the cut-off date, then the court does not have jurisdiction to review the Board's actions.

i.   The Board's Decision that Breeze's Trainee Pilots Were Ineligible to Vote in the Representation Election Did Not Grossly Violate the RLA.

Breeze argues the Board grossly violated the RLA when it determined that Breeze's 71 Trainee Pilots were not voting-eligible employees within the craft or class for the purposes of the representation election.  Breeze alleges that in making this determination the Board applied an

interpretation of "employee" that is contrary to the RLA, and that "There is nothing in the RLA's statutory language that states employees in training are not considered employees for purposes of the RLA."  Compl. ¶¶ 10–11, ECF No. 2; Opp. Mots. Dismiss 14–20, ECF No. 37; see 45 U.S.C. § 151, Fifth (defining employee); 45 U.S.C. § 181 (applying RLA to air carriers and clarifying "employee").  Breeze focuses on the RLA's definition of "employee," and argues that the Trainee Pilots "more than satisf[y]" its requirements, and alleges the Board "grossly violated the RLA by concluding otherwise."  Opp. Mots. Dismiss 20, ECF No. 37;  Compl. ¶¶ 50–52, ECF No. 2.

But deciding whether the Trainee Pilots are Breeze "employees" was not the crux of the Board's representation election eligibility analysis or decision.[6]  Rather, the Board framed the decision before it as a question of "which employees" were eligible to vote in the representation election.  Breeze Aviation, 49 NMB at 118 (noting the Board is empowered by the RLA to "determine which employees are eligible to participate" in a representation election and finding "employees who have not completed their training and are not flying in revenue service in the craft or class as of the cut-off date are ineligible.").  It focused on this issue because being an employee is not enough to make an individual eligible to vote in a representation election. Under the RLA, an individual must be part of the relevant craft or class of employees to be eligible to vote.

The RLA's text confirms that the inquiry undertaken by the Board was necessarily a craft or class determination, rather than merely a decision about whether the Trainee Pilots were employees.  In relevant part, the RLA says "Employees shall have the right to organize and

---

[6] The Board equivocates about this issue in its briefing.  The Board says the Trainee Pilots "were not employees for purposes of the RLA and were therefore not eligible to vote in the union election."  Board Mot. Dismiss 8, ECF No. 28.  It also claims it "has not disputed the trainee pilots' status as Breeze employees."  Reply Supp. Board Mot. Dismiss 4, ECF No. 39.  As discussed above, the Board was not similarly equivocal in the challenged determination itself.

bargain collectively through representatives of their own choosing.  <u>The majority of any craft or</u> <u>class</u> of employees shall have the right to determine who shall be the representative of the craft or class."  45 U.S.C. § 152, Fourth (emphasis added); Compl. ¶ 9, ECF No. 2 (citing same). Breeze emphasizes the majoritarian element of this provision.  <u>See, e.g.</u>, Compl. ¶¶ 46, 50–52, ECF No. 2.  But the relevant majority is the majority <u>of the appropriate subset</u> of employees; put differently, what matters is not simply the determination of the majority of employees, what matters is the determination of "the majority of [the] craft or class of employees."  <u>See</u> 45 U.S.C. § 152, Fourth; <u>cf.</u> Representation Manual § 1.02(2) (citing NMB Rule §1203.2, 29 C.F.R. §1203.2) (framing "craft or class" as a subset of employees by requiring that applications to the Board, among other things, "specify the craft or class of employees and the estimated number of employees in the craft or class.").  Reflecting this, in arguing for the 71 Trainee Pilots to be deemed eligible to vote in the representation election, Breeze asked "the Board to find the 71 pilots were employees within the craft or class of [pilots] properly included on the list."  <u>See</u> Compl. ¶ 32, ECF No. 2.  It did not merely ask the Board to find that the 71 Trainee Pilots were employees.  <u>Id.</u>  While the Board did not find in Breeze's favor on this issue, it did oblige Breeze by making a determination about whether the Trainee Pilots were in the relevant craft or class. In sum, the Board's decision about whether the Trainee Pilots were eligible to vote in the representation election was not merely a decision about whether they are employees, it was a craft or class determination.  <u>Breeze Aviation</u>, 49 NMB at 113–17.

That Breeze is challenging the Board's craft or class determination is important for the jurisdictional question before the court.  The RLA empowers the Board to determine who may participate in a representation election.  <u>See</u> 45 U.S.C. § 152, Ninth ("In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the

election and establish the rules to govern the election").  Federal courts have confirmed that the power to decide who is eligible to participate in a representation election, and consequently the power to determine who is in a craft or class for the purposes of a representation election, rests with the Board.  In Switchmen's Union of N. Am. v. National Mediation Board, the Supreme Court observed that the RLA

> writes into law the "right" of the "majority of any craft or class of employees" to "determine who shall be the representative of the craft or class for the purposes of this Act."  That "right" is protected by [the Act's provision] giv[ing] the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held.

320 U.S. 297, 300–01 (1943).  The Tenth Circuit has also confirmed that the power and discretion to resolve disputes about who is, and who is not, within a class does not lie with the federal courts.  It lies with the Board.  Kiamichi, 986 F.2d at 1343 (citing Switchmen's Union, 320 U.S. at 301) ("The power to resolve disputes concerning class or craft designations for a representation election belongs to the NMB . . . and not to the federal courts.").

The Board exercised this power in assessing whether the 71 Trainee Pilots were within the craft or class pilots for purposes of the representation election.  Breeze Aviation, 49 NMB at 113 (noting an issue before the Board was "Should the Trainee Pilots be included in the List[ of Potential Eligible Voters]?").  This is not the first time the Board has exercised its responsibility to investigate representation disputes and designate who may participate as eligible voters in a representation election, see 45 U.S.C. § 152, Ninth, by considering whether trainees were eligible and concluding that they are not.[7]  For example, in Re: Delta Air Lines, Inc., as here, the

---

[7] In criticizing the Board's decision, Breeze also argues that "the Board grossly violated the RLA by applying a blanket exclusion of individuals in training when determining employees' eligibility to participate in a union election."  Opp. Mots. Dismiss 19, ECF No. 37.  To the extent the "blanket exclusion" criticism is an objection to Board procedures, it is unavailing.  See id. ¶

Board considered whether trainees were eligible to vote in a representation election.  There, the Board said, "A trainee's eligibility hinges on whether the 'person has performed services for the employer under that employer's supervision.'"  35 NMB 173, 177 (May 28, 2008) (quoting Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc., 802 F.2d 886, 913 (7th Cir. 1986), cert. denied, 480 U.S. 946 (1987)).  But the Board further specified that "[u]ntil individuals training for in-flight functions have successfully completed their IOE[ Initial Operating Experience], they have not performed line functions and therefore are not eligible" to vote in these elections.  Id. (quoting Re: America West Airlines, Inc., 16 NMB 135, 144 (1989)); see also Re: Executive Jet Aviation, Inc., 28 NMB 467, 468 (2001) (finding trainees who had not completed an IOE were ineligible to vote due to insufficient evidence they had performed line functions in the craft or class, which is required to establish voter eligibility).

Deciding that Breeze's 71 Trainee Pilots were not eligible voters was a similar exercise of the Board's authority to determine the membership of a craft or class.  As noted above, making this type of distinction—about who may participate in a representation election—is within the Board's power.  Kiamichi R. Co., 986 F.2d at 1343 (citing Switchmen's Union, 320 U.S. at 301).  And, using the "line functions" criteria was in line with past Board decisions.  E.g., Executive Jet Aviation, 28 NMB 467.  Consistent with its past decisions, in Breeze's case the Board observed that "The question here is whether the Trainee Pilots have performed line work in the Flight Deck Crew Members craft or class as of the cut-off date, and there is no dispute that they have

---

26 (alleging Board "[p]rovid[ed] no factual or case specific analysis" to support its conclusion).  The Board engaged in case-specific investigation and analysis when deciding that the Trainee Pilots were ineligible to participate in the representation election.  Breeze Aviation, 49 NMB at 116–17 (analyzing evidence including Breeze executive's declaration and noting "Breeze . . . presented no evidence that any of the Trainee Pilots have completed their IOE and performed line work in the Flight Deck Crew Members craft or class.").

not." Breeze Aviation, 49 NMB at 116.  This conclusion is reflective of the fact that the only

work Breeze describes the 71 Trainee Pilots as having done under Breeze's supervision was

training-related.  See id. ¶ 40 ("Breeze directed and supervised these pilots on when, where, and

how to complete their required training.").  There is no indication that the 71 Trainee Pilots

performed "line functions" as of the cut-off date.  Indeed, they could not have done so; they were

not qualified to perform line work as pilots because they had not completed their training.  See

ALPA Mot. Dismiss 4, ECF No. 33 (citing 14 C.F.R. § 121.434(a)) ("none of the Trainee Pilots

could lawfully work as pilots under FAA rules because none had completed necessary training,

which includes . . . an [IOE]."); Re: Am. W. Airlines, Inc., 18 NMB 140, 141 (Feb. 6, 1991)

("All [airline] flight officers including captains, first officers and flight engineers undergo

training as required by . . . (FAA) regulations.").  The Board's determination about Breeze's

Trainee Pilots also reflects the "actual duties and responsibilities" of its pilots versus its Trainee

Pilots.  On the cut-off date, Breeze Trainee Pilots were not, by law, able to perform the same

duties or hold the same responsibilities as Breeze pilots who were flying in service.  See Re:

USAir, Inc., 21 NMB 402, 404–06 (Aug. 18, 1994) (explaining Board decides appropriate craft

or class based on actual duties and responsibilities of workers); Am. W. Airlines, Inc., 18 NMB

at 141 (noting FAA training requirements).

The Board's determination, arrived at by the method discussed above, was not a gross

violation of the RLA because, while the RLA defines employee, it neither defines "craft or class"

nor tells the Board how it must determine a craft or class's boundaries.  The Board's other

guidance is similarly quiet, apart from requiring that "Crafts or classes must be system-wide."

NMB, Overview & FAQ, https://nmb.gov/NMB_Application/index.php/overview-faq; see Opp.

Mots. Dismiss 17 n.1 (citing 45 U.S.C. § 152, Fourth).  Reflecting the RLA's silence, some

courts have observed that "The Board has great discretion to designate appropriate crafts or classes by regrouping, amalgamating, or splintering historic bargaining groups—and that designation is unreviewable." In re Cont'l Airlines Corp., 50 B.R. 342, 369 (S.D. Tex. 1985), aff'd, 790 F.2d 35 (5th Cir. 1986) (citing UNA Chapter, Flight Eng'rs' Int'l. Ass'n v. Nat'l Mediation Bd., 294 F.2d 905, 908 (D.C. Cir. 1961) ("UNA"); cert. denied 368 U.S. 956); see also UNA, 924 F.2d at 908 ("The court did not err when it dismissed the complaint for lack of jurisdiction.  Under the [RLA] only the NMB . . . has the power to make craft or class determinations . . . [and] the decision of the Board in setting up a 'class' for representation in a jurisdictional dispute is unreviewable in the courts."); Dr. v. Seaboard Coast Line R. Co., 540 F.2d 699, 702 n.4 (4th Cir. 1976) ("Operating employees of a railroad are grouped in crafts for bargaining purposes under the authority of the [RLA]. . . . Designation of such crafts for bargaining purposes by the National Mediation Board is not judicially reviewable.").  But even assuming a Board's craft or class determination is reviewable where "the complaining party shows 'on the face of the pleadings that the certification decision was a gross violation of the [RLA],'" Kiamichi, 986 F.2d at 1343–44 (quoting Trans World Airlines, 839 F.2d 809), Breeze has not shown that the Board grossly violated the RLA in determining the Trainee Pilots were outside the craft or class eligible to vote in the representation election.  "Craft or class" is not defined in the RLA, and a peek at the merits indicates the craft or class determination here was a typical exercise of the Board's authority under the RLA, not a gross violation of the RLA.  As a result, the court does not have jurisdiction over the Board's decision.

ii.   The Board's Refusal to Move the Cut-Off Date Did Not Grossly Violate the RLA.

Breeze's argument that the Board "grossly violated" the RLA by refusing to modify the eligibility cut-off date is similarly unavailing.  First, the RLA gives the Board exclusive authority

to "establish the rules to govern the election."  45 U.S.C. § 152, Ninth; Compass Airlines, 35 NMB 14, 20–21 (2007) ("the NMB has the discretion under the RLA to establish rules for the cut-off date and for eligibility to vote in an election, and to deviate from those rules in the face of unusual or extraordinary circumstances.").  Establishing a representation election eligibility cut-off date, and deciding about whether to modify that date, is plainly within that authority.

Second, Breeze cites no authority indicating the Board's cut-off date determination was a gross violation of the RLA rather than an acceptable exercise of its discretion.  The RLA "provides that the majority of any craft or class may select a representative."  Re: USAir/TWU, 10 NMB 495, 496 (Sept. 13, 1983).  The Board has, accordingly, moved a cut-off date where "less than a majority of the craft or class will be eligible to vote using the Board's normal procedures" due to a "substantial degree of turn-over."  Id.  But Breeze's circumstances "deal[] with the expansion of a craft or class, rather than turnover."  Breeze Aviation, 49 NMB at 118.

USAir/TWU highlights why this is a salient difference and why the Board's decision about Breeze's cut-off date does not conflict with the RLA's majoritarian requirement.  The Board issued its decision about USAir/TWU's cut-off date on September 13, 1983.  10 NMB 495.  The Board changed the cut-off date for the representation election from the original cut-off date of August 14, 1981, to August 5, 1983.  Id. at 495–96.  The Board noted the change was appropriate because "Since the original cut-off date, the number of eligible employees has been reduced to 13, and 13 newly hired employees have entered the craft or class."  Id. at 495.  The Board issued its decision about Breeze's cut-off date on June 8, 2022.  Breeze Aviation, 49 NMB at 112.  It denied Breeze's request to move the cut-off date from the original cut-off date of March 31, 2022, to September 30, 2022.  Id. at 117.  Unlike in USAir/TWU, between the original March 31, 2022 cut-off date, and the Board's June 8, 2022 denial of Breeze's request to

16

move the cut-off date, there were no reductions in the number of eligible employees or new employees that had entered the craft or class.  See Compl. ¶ 47, ECF No. 2. [8]  The individuals excluded from voting in the election were Breeze's Trainee Pilots.  As discussed above, assuming they successfully completed their training, they might have become craft or class members in the future, but by the Board's June 8, 2022 decision they had not entered the craft or class.  Consequently, the RLA's majoritarian requirement was not violated by the Board's decision not to move the cut-off date; because the craft or class did not include the Trainee Pilots, the majority of the craft or class of Breeze employees could vote in the representation election.

Further, Breeze's cited authorities show the Board can move a cut-off date and when it has done so in the past.  They do not establish that refusing to change a cut-off date—even if extraordinary or unusual circumstances are present, as Breeze argues they are here—is a gross violation of the RLA, or that the Board's decision not to move the cut-off date here was such a violation.  See Opp. Mots. Dismiss 26–27, ECF No. 37 (arguing Board should have changed cut-off date here as in Compass).  Indeed, previous Board decisions underline that extraordinary or unusual circumstances were not present here.  The expansion of carrier operations, and the hiring of new employees accompanying the expansion, is not an "unusual" circumstance.  It is one the Board has faced before.  Re: Am. Int'l Airways/TWU, 10 NMB 456, 456–57 (Aug. 11, 1983) (finding no basis for reversing Board refusal to modify cut-off date and "that the carrier is expanding its operations, and thus hiring new employees, does not provide a reason for making an exception to the Board's established practice with respect to the cut-off date in representation

---

[8] After the Board's June 8, 2022 decision authorizing the election, other Breeze Flight Deck Crewmembers were determined to be ineligible to vote, on other grounds.  See Compl. ¶ 48.

cases."). Similarly, the Board has previously determined that longer delays than those Breeze endured here are not "extraordinary." Norwegian Air Shuttle ASA, 43 NMB 140, 144 (June 21, 2016) (finding year-long delay not to be "an extraordinary delay," and that the "time is well below the five years the Board has found justifies a change in the cut-off date."). The delays caused by the A220 approval process put Breeze seven months behind schedule. Compl. ¶ 26, ECF No. 2. To be sure, the Board has modified a cut-off date in the context of shorter delays. See Breeze Aviation, 49 NMB at 117 (noting three-and-a-half month Compass delay). But Breeze points to nothing in the RLA requiring the Board to modify the cut-off date in circumstances like these, and it is unclear how it would grossly violate the RLA when the Board acts as it has here.

Third, the facts of Compass highlight that it was not a gross violation of the RLA for the Board to follow a different path with Breeze than it did in Compass.[9] To be sure, there are similarities between the cases. The airlines in both were "start-up carrier[s] with a rapidly expanding workforce." Compass, 35 NMB at 19; Compl. ¶ 21, ECF No. 2. And factors outside the airlines' control were implicated in both situations as reasons to, potentially, move the cut-off date. In Compass, it was a slow Board decision that caused delays. Compass, 35 NMB at 21 (noting change to cut-off date was partially due to "time required to resolve the complex and novel issues presented by the parties"). For Breeze, the Trainee Pilots were delayed in finishing their training due to a slow FAA approval process. See Compl. ¶ 33, ECF No. 2.

But Compass is distinguishable from the case at hand. One difference is the potential disenfranchisement that would result from not moving the cut-off date. In Compass, there were

---

[9] As does the plain language of Compass, where the Board "expressly limited [its determination] to the unique facts and circumstances present in this case and does not establish a precedent for [the] handling of other representation cases." 35 NMB at 21–22.

20 active class members (flight attendants) on the original cut-off date, but that number ballooned to 70 by the modified cut-off date.  Compass, 35 NMB at 21.  This led the Board to observe that "use of the original cut-off date . . . would mean that significantly less than a majority of the craft or class will be eligible to vote."  Id.  Here, the Board authorized an election with 66 eligible voters that excluded the 71 Trainee Pilots.  When the Board authorized the election on June 8, 2022, use of the original cut-off date meant that slightly fewer than half of the pilots hired by the cut-off date were eligible to vote, and further that all members of the craft or class were eligible to vote.  See Compl. ¶¶ 44, 47, ECF No. 2.

The timing of the proposed/modified cut-off date, in relation to the date on which the Board reached its decision, also differs between these cases.  In Compass, the Board modified the cut-off date from August 15, 2007 to November 1, 2007.  35 NMB at 21.  The Board issued its decision modifying the cut-off date on November 29, 2007.  Id.  The Board moved the cut-off date to a date that had already passed at the time the Board issued its decision.  Id.  Breeze requested a longer extension, from March 31, 2022 to September 30, 2022.  Breeze Aviation, 49 NMB at 117.  The Board issued its denial of Breeze's request to modify the cut-off date on June 8, 2022.  Id. at 117–18.  Had the Board moved the cut-off date, the new cut-off date would have been months after the Board issued its decision.  Put differently, the Board moved the cut-off date in Compass to a date that had already passed, while the Board declined to move the cut-off date in Breeze's case to a date in the future.  This difference is meaningful in the context of the statute.  As Breeze notes, "The stated basis for the Board's policy [of declining to change the cut-off date absent extraordinary or unusual circumstances] is because fixing the cut-off date at the commencement of the investigation insulates the representation process from manipulation by either side in order to gain an advantage with respect to the . . . election results."  Compl. ¶ 18,

ECF No. 2; see Breeze Aviation, 49 NMB at 118 (observing moving cut-off date here would "frustrate the purpose of the cut-off date.").  In Compass, because the new cut-off date had already passed when the Board issued its order modifying the cut-off date, the time for manipulating the representation process had also already passed.  But, by moving the election to a date after the Board issued its decision, Breeze's requested cut-off date would have undermined the RLA's goal of insulating the representation process from manipulation.

A peek at the merits does not reveal on the face of the papers that the Board grossly violated the RLA by declining to move the cut-off date, even though the Board has moved such dates in the past.  The court does not have jurisdiction over the Board's cut-off date decision.

## III.    Conclusion

Courts asked to review the Board's actions have observed we are "limited . . . in our jurisdiction to reviewing 'gross violation[s]' of the RLA."  Pro. Cabin Crew Ass'n, 872 F.2d at 460 (citing Int'l Ass'n of Machinists, 839 F.2d at 811).  Breeze's allegations of gross violations have not "crosse[d] this lofty threshold."  Id.  Consequently, the court does not have jurisdiction to review the challenged Board actions.  It grants the Board's Motion to Dismiss.

As noted above, ALPA has filed a separate motion to dismiss.  ECF No. 33.  Having already dismissed Breeze's claim, the court does not reach the issues raised by ALPA's Motion to Dismiss under Rule 12(b)(6).  Instead, the court holds that ALPA's Motion to Dismiss under Rule 12(b)(6) is moot.  See Kenney v. Helix TCS, Inc., 284 F. Supp. 3d 1186, 1188 (D. Colo. 2018), aff'd, 939 F.3d 1106 (10th Cir. 2019) (quoting Mounkes v. Conklin, 922 F. Supp. 1501, 1506 (D. Kan. 1996)) ("Where, as here, a defendant seeks dismissal under Rule 12(b)(1) and Rule 12(b)(6) in the alternative, 'the court must decide first the 12(b)(1) motion for the 12(b)(6) challenge would be moot if the court lacked subject matter jurisdiction.'").

**IV.** <u>**Order**</u>

For the reasons discussed above the court ORDERS that Defendant National Mediation Board's Motion to Dismiss (ECF No. 28) is GRANTED.  Breeze's Complaint is DISMISSED WITHOUT PREJUDICE.  Intervenor Defendant Air Lines Pilots Association's Motion to Dismiss is DENIED as moot (ECF No. 33).

SIGNED May 23, 2023.

BY THE COURT

*Tena Campbell*
_____
Tena Campbell
United States District Judge